[Civ. No. 25450. Third Dist. May 5, 1986.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF SAN JOAQUIN COUNTY, Respondent;
MICHAEL L. HAFLICH, Real Party in Interest.

762

## COUNSEL

John D. Van de Kamp, Attorney General, Joel Carey and Garrick W. Chock, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Van Dyke, Schuckman & Van Dyke and William A. Schuckman for Real Party in Interest.

## OPINION

**PUGLIA, P. J.**—An information charges real party in interest, Michael L. Haflich (defendant), with possession of cocaine and marijuana for sale. (Health & Saf. Code, §§ 11351 and 11359, respectively.) The trial court granted defendant's motion to suppress evidence (Pen. Code, § 1538.5). The People seek a writ directing the trial court to vacate its suppression order. (Pen. Code, § 1538.5, subd. (o).) In its petition, the People assert the informant, upon whose information the searching officers relied, must be deemed a citizen and, as such, reliable. We agree.

Vice Principal Gregory Wright of the Claudia Landeen School was summoned to the school office during a lunch period to deal with a disturbance. When Wright arrived, he saw a man, later identified as Bruce Porter, talking loudly into the telephone. The school secretary stated Porter was talking to the police and that she had dialed the number for him. Porter refused Wright's request to relinquish the telephone so Wright took it away from him. Wright identified himself on the telephone to a member of the Stockton Police Department who asked whether the call was a joke.

Meanwhile, Porter appeared very nervous and kept looking out the front window. He told Wright some men armed with guns had forcibly entered the house where he had been. He escaped and made his way to the school to get help. He was afraid the intruders were going to kill his friend who

was still in the house and then come after him. Porter tried to get Wright to clear the school building because he thought the armed men were going to come there.

On the telephone Wright described Porter to the police as "very hyper . . . out of control . . . in a very scared state of mind." He asked the police to send someone to take care of Porter. Wright and another male teacher then escorted Porter outside where they were met by Captain Perry of the Stockton Police Department.

Wright told Captain Perry that Porter was not rational and seemed very fearful. Porter, who was extremely excited, told Captain Perry he had been at a friend's house when three men with handguns broke into the house, and he was afraid his friend was going to be killed. Captain Perry asked Porter to get into the patrol car so he could check on the report. Porter did so and directed Captain Perry to the house of his friend about a block from the school. During the drive, Porter cowered in the car and appeared extremely frightened. They arrived at the house approximately three to four minutes after Captain Perry first encountered Porter at the school. Captain Perry requested back-up units to cover a possible armed robbery in progress. Sergeant Mazzilli and Officer Padilla arrived immediately thereafter. Meanwhile, Porter hid on the floorboard of Captain Perry's car.[1]

Captain Perry directed Sergeant Mazzilli to cover the rear of the house. Captain Perry and Officer Padilla positioned themselves by the front of the house with guns drawn. Captain Perry rang the doorbell. A man, later identified as defendant Haflich, stuck his head out of the closed drapes. He was directed to open the door and come outside. About one and one-half to two minutes later, he opened the door but did not come outside. After Captain Perry unsuccessfully directed him three times to come out, Officer Padilla grabbed him by the arm and pulled him outside. Captain Perry told defendant they were there to investigate a report of a possible burglary or robbery and they wanted to check the house. He did not know whether defendant might be a suspect or a victim. Defendant told the officers they could not go into the house. Captain Perry replied they were going in because it was necessary to investigate the report. Captain Perry, Sergeant Mazzilli, Officer Padilla and defendant all went inside. Defendant continued to protest,

---

[1] As the officers approached the house, Porter jumped out of the patrol car and ran across the street. When Officer Arellano arrived at the scene, he was informed by a passer-by that Porter was across the street and appeared to be under the influence of something. Arellano observed Porter hiding behind a post. Porter was hysterical and was dodging imaginary bullets from imaginary people on the roofs of nearby houses. Officer Arellano arrested Porter for being under the influence. At the hearing Porter testified that he had been drinking beer since 6 p.m. the day before the incident and had taken six to twelve prescription tranquilizers.

stating he was the owner of the house and could prove it by some papers in a nearby desk. Captain Perry refused to allow defendant to open the desk because there might be a weapon in it; moreover, he first wanted to determine whether there were people in the house. The officers proceeded to search the house for suspects. They did not find anyone, but they did observe in plain view on the bathroom counter a sifter, scale, plastic baggies, spoon, some white powder, and marijuana.

The discovery of these items led to the issuance of a search warrant. The validity of the search warrant depends on the lawfulness of the warrantless entry and search. No other challenge is made to the search warrant.

Captain Perry testified he entered the house because Porter reported an incident involving people with guns and expressed fear for his safety as well as the safety of his friend. Captain Perry "had no reason not to think that there could be a burglary, a robbery or anything else in progress at that location;" he did not believe there was any alternative to a visual search of the house. Asked if he "consider[ed] whether or not [Porter] might be under the influence of some type of drug or narcotic," Captain Perry replied he did not consider it because it "was not a priority" at that time. He believed Porter's statements were reliable because of "His panic, his obvious fear" and because he "had no reason not to believe him."

Porter testified he believed he told Captain Perry he had been drinking and taking tranquilizers and did not feel he was in his right mind.

In granting defendant's motion to suppress, the trial judge stated there was no evidence of the informant's reliability. The court found that Captain Perry was an experienced police officer and would know that somebody acting as Porter had was under the influence of some intoxicant. The court further found Porter's identity was not established and expressed the belief the law requires some minimal verification to establish a source as a citizen informant. The court concluded that some minimal inquiries should have been made in view of Porter's conduct and Captain Perry's experience.[2]

---

[2]The comments of the court in conjunction with its oral ruling follow in their entirety:
"T C: All right, the Court has been listening to this as we said for day and a half and I've read all the points and authorities. I am satisfied under the case law and the facts of this case there is no evidence whatsoever of the reliability of the informant, which is really the crux of it. If there was from there on I don't have any problems with it but there simply is not. We didn't even get his name. He—Captain Perry is a very experienced and able police officer and he would know that somebody acting like that is under the influence of something or other. I think there was some minimum things that should have been done and I know that exigent circumstances, every case is different, and I certainly understand that, and it is not for a judge to sit back and to second-guess but I'm not second-guessing, I'm looking at this and this individual was totally out of it, he—his identity wasn't even

■ In ruling on a motion to suppress evidence, the trial court must first find the material facts and draw inferences therefrom. An appellate court must uphold these findings if they are supported by substantial evidence. Here, although the material facts are undisputed, they are susceptible to conflicting inferences. Thus from the uncontradicted evidence it is reasonable to infer either that Captain Perry subjectively and in good faith believed Porter's report of dangerous criminal activity, or that he did not and was simply using the incident involving Porter as a pretext to search.

■ It is manifestly apparent from the trial court's ruling (fn. 2, *ante*, p. 765) that the court credited Captain Perry with a genuine belief in the probability that Porter's information was valid. The question is then reduced to whether, given the surrounding facts and circumstances, it was objectively reasonable for Captain Perry to act as he did in reliance upon his belief in the probable validity of Porter's information. This is a question of law first confided to the trial court, i.e., whether, under the facts found, the search was reasonable. The trial court concluded the search was unreasonable. An appellate court, however, must exercise its independent judgment in determining whether the facts as found and the inferences drawn by the trial court measure up to the constitutional standard of reasonableness. (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621]; *People* v. *Leyba* (1981) 29 Cal.3d 591 [174 Cal.Rptr. 867, 629 P.2d 961].)

■ In order to have a valid search the officers must have probable cause to believe the object of the search is in the particular place to be searched. (See *People* v. *Dumas* (1973) 9 Cal.3d 871, 885 [109 Cal.Rptr. 304, 512 P.2d 1208]; *New Jersey* v. *T. L. O.* (1985) 469 U.S. 325 [83 L.Ed.2d 720, 734, 105 S.Ct. 733].) Probable cause is based upon an objective standard of reasonableness, i.e. whether the officer is aware of facts that would lead a reasonable person to believe that the object of the search is in the particular place to be searched. (See *Dumas, supra,* 9 Cal.3d at p. 885; *Terry* v. *Ohio* (1968) 392 U.S. 1, 22 [20 L.Ed.2d 889, 906 [88 S.Ct. 1868].) The issue of probable cause depends on the facts known to the officer prior to the search. (See *People* v. *Ramey* (1976) 16 Cal.3d 263, 268 [127 Cal.Rptr. 629, 545 P.2d 1333].)

---

established and the case law requires some minimal verification to show that we have a citizen informant. If that isn't done then the presumption that a citizen is—is in fact established that a citizen informant you have not then at least done that. If you can establish that the person is in fact a citizen informant then it is presumed to be reliable. But you are not to close your eyes to any other relevant facts that may exist, so even if he had identified himself as a citizen and satisfied that aspect of it I think at least some minimal inquiries would have to have been made in view of his conduct and certainly in view of this officer's experience and expertise.

"The motion is therefore granted."

Probable cause may be supplied by information from a citizen informant. (See *Ramey, supra,* at pp. 268-270.) In *Ramey, supra,* the Supreme Court discussed at length the reliability of citizen informants. The court recognized a distinction between informants who are "virtual agents of the police" and citizen informants who are "chance witnesses to or victims of crime." (P. 268.) The former tend to be criminally disposed or implicated and supply their information for pecuniary gain whereas the latter are innocent of criminal involvement and volunteer their information "through motives of good citizenship." (P. 269.) Thus, the necessary showing of reliability in the case of a citizen informant "is significantly less than that demanded of a police informer." (*Ibid.*) The court found that absent circumstances casting doubt on their reliability, citizen informants should be considered reliable. (*Ibid.*) The court emphasized, however, that citizen informants still must supply facts sufficiently detailed to give rise to probable cause to believe criminal activity is afoot. (*Ibid.*) The court noted the rule "presupposes that the police be aware of the identity of the person providing the information and of his status as a true citizen informant." (*Ibid.*)

 In this case the trial court concluded that Porter could not be considered reliable because he was obviously under the influence of something and as an experienced police officer Captain Perry would have been aware of that fact. It will be recalled Captain Perry did not deny such awareness; he simply regarded it as irrelevant under the circumstances and therefore did not consider it. The trial court concluded that Porter's condition of obvious intoxication rendered it objectively unreasonable for Captain Perry to rely upon Porter. We disagree with this conclusion.

First, it is undisputed that Porter was in an obvious state of panic and evinced fear for his life and the life of his friend. Captain Perry was aware of this fear and it weighed heavily in his decision to search. Porter's conduct was not inconsistent with that of someone just subjected to three armed robbers bursting into a house who had escaped to call the police while his friend remained in danger. Even though Captain Perry was aware Porter was under the influence of something, as the trial court found, he should not therefore necessarily have assumed Porter's report of criminal activity was the product of delusion or hallucination. As a matter of common knowledge, users of alcohol and narcotics are often the victims of violent crimes. Police officers should not be required to ignore reports of ongoing violent criminal activity merely because the informant is under the influence. Such a rule would needlessly jeopardize the lives and safety of individuals who truly may be the victims of violent crime. Given the life threatening nature of the ongoing criminal activity reported to him, Captain Perry reasonably relied on the information supplied by Porter.

The trial court also concluded Captain Perry should have obtained Porter's identity prior to conducting the search. *Ramey, supra,* states the police should be aware of the "identity of the person providing the information and of his status as a true citizen informant." (16 Cal.3d at p. 269.) This does not mean the police necessarily must obtain the name of an informant before they act on his information. Unless the informant is a well known public figure whose reputation for probity is virtually synonymous with his name, determination of his name alone adds nothing to his reliability. Rather the police must have reason to believe, and in fact believe, the informant is truly a citizen informant as opposed to a police informant. This belief and its reasonableness must be gathered from the surrounding circumstances one of which, mere name alone, is rarely relevant.

The difference between the two types of informant, citizen informants and police informants, goes to the issue of reliability. Porter's status as a citizen informant is unquestioned. Furthermore, unlike the anonymous informant in *Ramey,* Porter was physically present when he conveyed his information to the police and he personally directed Captain Perry to the scene of the alleged crime. (See *Horack* v. *Superior Court* (1970) 3 Cal.3d 720, 726 [91 Cal.Rptr. 569, 478 P.2d 1].) Failure to obtain Porter's name prior to entering defendant's house does not foreclose reasonable reliance on his information.

Having concluded that Porter was an unreliable informant as a matter of law, the trial court had no occasion to go further. Our disagreement with that conclusion, however, leads to additional inquiries, i.e., whether Porter's information supplied probable cause to search defendant's house and if so, whether a warrantless entry and search were justified. Since the material facts are undisputed, these issues present questions of law which it is within our province to resolve.

Captain Perry believed Porter was in an extreme state of fear when they talked. This belief was supported by his own observation and the school official's description of Porter's behavior. Porter told Captain Perry he had been at a friend's house when three armed robbers burst in; he had managed to escape but his friend was still in the house. Although defendant appeared calm and protested the officer's entry to his house, Captain Perry testified he did not know whether he might be a victim or an assailant. Given the life threatening nature of the reported crime, Porter's demeanor which was consistent with such a crime, the lack of any instantaneous means to resolve defendant's status as a suspect, a victim or perhaps neither, the fact that users of narcotics are often the victims of violent crimes and that it was not unreasonable to give credence to Porter's report of criminal activity, Captain Perry had probable cause to enter defendant's house and look for victims

and suspects. (See e.g. *Dumas, supra,* 9 Cal.3d at p. 885; *Terry* v. *Ohio, supra,* 398 U.S. at p. 22 [20 L.Ed.2d at p. 906].)

However, warrantless searches of private dwellings are unreasonable per se in the absence of one of a small number of carefully circumscribed exceptions. (*Vale* v. *Louisiana* (1970) 399 U.S. 30, 34-35 [26 L.Ed.2d 409, 413-414, 90 S.Ct. 1969]; see also *Ramey, supra,* 16 Cal.3d at p. 270.) One such exception is the existence of exigent circumstances. (See *Vale, supra,* 399 U.S. at pp. 34-35 [26 L.Ed.2d at p. 413-414]; *Ramey, supra,* 16 Cal.3d at p. 276.) Exigent circumstances exist in "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*Ramey, supra,* at p. 276.)

In this case, the facts known to Captain Perry reasonably indicated an imminent danger to life and the possibility of escape of violent criminals. Defendant's assurances and protests did not relieve the exigency because the officers could not confirm his bona fides or ascertain whether in fact there were victims or suspects still in the house. Nor would documentary evidence of defendant's ownership of the house itself have rendered further reliance on Porter's information unreasonable. For that reason as well as the danger posed to the officers by a possible weapon concealed therein, it was not unreasonable to prevent defendant from access to the closed desk drawer ostensibly to obtain documentary evidence of ownership. A warrantless search for suspects and victims was justified by the circumstances. Once the officers were lawfully in the house searching for suspects and victims, they were entitled to seize contraband in plain sight. (*People* v. *Block* (1971) 6 Cal.3d 239, 243 [103 Cal.Rptr. 281, 499 P.2d 961].)

Let a peremptory writ of mandate issue directing respondent court to vacate its order suppressing all evidence seized from defendant's house and to enter a new order denying defendant's motion to suppress. The alternative writ is discharged and the stay previously issued is vacated.

Blease, J., and Carr, J., concurred.

A petition for a rehearing was denied May 30, 1986, and the petition of real party in interest for review by the Supreme Court was denied August 13, 1986.